CATHERINE CORTEZ MASTO
Attorney General of the State of Nevada
ERIC WITKOSKI
Consumer Advocate and Chief Deputy Attorney General
BRIAN ARMSTRONG, Bar No. 8761
Senior Deputy Attorney General
Office of the Attorney General
Bureau of Consumer Protection
555 E. Washington Ave., Suite 3900
Las Vegas, Nevada 89101
Telephone:  (702) 486-3420
Fax:  (702) 486-3283
Email: antitrust@ag.nv.gov
Attorneys for Plaintiff State of Nevada

Constance L. Akridge, Bar No. 3353
Jones Vargas
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, Nevada 89169
Telephone: (702) 862-3300
Fax:  (702) 734-2722
Email: cakridge@jonesvargas.com
Attorney for Defendants
UnitedHealth Group Incorporated and Sierra Health Services, Inc.

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **THE STATE OF NEVADA by its ATTORNEY GENERAL CATHERINE CORTEZ MASTO**<br><br>Plaintiff,<br><br>v.<br><br>**UNITEDHEALTH GROUP INCORPORATED and SIERRA HEALTH SERVICES, INC.,**<br><br>Defendants. | Case No.: 2:08-cv-00233-JCM-(RJJ)<br><br>**STIPULATED/CONSENT JUDGMENT – JOINT REQUEST FOR ENTRY OF AMENDED FINAL JUDGMENT** |

On October 8, 2008, the Court entered a Stipulated Final Judgment in this civil antitrust action.  Plaintiff State of Nevada, with the consent of Defendants UnitedHealth Group Incorporated and Sierra Health Services, Inc., now requests that the Court enter a proposed Amended Final Judgment, attached as Exhibit A.  In support of this request, Plaintiff states as follows:

1.      After a thorough investigation, Plaintiff alleges that Defendants violated the Stipulated Final Judgment, which, by its terms, does not expire until October 7, 2013.  Plaintiff and Defendants have resolved their dispute in this regard by entering into a Letter Agreement, attached as Exhibit 1.  Section A of the Letter Agreement describes the basis for Plaintiff's conclusion that Defendants violated the Stipulated Final Judgment.  Paragraph B(1) of the Letter Agreement indicates that Defendants deny that a violation occurred.  Meanwhile, Paragraph B(2) of the Letter Agreement provides for a monetary payment to Plaintiff.  And, Paragraph B(3) of the Letter Agreement reflects Defendants' consent to the filing and Court's entry of the proposed Amended Final Judgment, while also summarizing the changes to the original Stipulated Final Judgment.

2.      Plaintiff believes that the filing of the Letter Agreement in the public record and the Court's entry of the proposed Amended Final Judgment will be an effective deterrent to possible future violations of court orders, and in turn, will promote compliance.


Respectfully submitted,

CATHERINE CORTEZ MASTO,
Attorney General of the State of Nevada
ERIC WITKOSKI,
Consumer Advocate and Chief Deputy Attorney General

By:     /s/ Brian Armstrong                          /s/ Constance L. Akridge
        BRIAN ARMSTRONG                          Constance L. Akridge

Senior Deputy Attorney General
Bureau of Consumer Protection

Jones Vargas

Attorneys for Plaintiff State of Nevada

Attorney for Defendants UnitedHealth
Group Incorporated and Sierra Health
Services, Inc.

Dated: June 22, 2011

**EXHIBIT INDEX**

| Number | Description |
|--------|-------------|
| 1 | Letter Agreement |
| A | Amended Final Judgment |

# CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2011, I caused a true and complete copy of Plaintiff's Stipulated/Consent Judgment – Joint Request For Entry Of Amended Final Judgment to be served on the following counsel of record through the Case Management/Electronic Case Files (CM/ECF) system.

CATHERINE CORTEZ MASTO, Attorney General
ERIC WITKOSKI, Consumer Advocate and
Chief Deputy Attorney General

By:     /s/ Brian Armstrong
BRIAN ARMSTRONG
Senior Deputy Attorney General
Bureau of Consumer Protection

Recipients:

**Attorneys for Defendants UnitedHealth Group Incorporated and Sierra Health Services, Inc.**
Constance L. Akridge
Jones Vargas
3773 Howard Hughes Parkway
3rd Floor South
Las Vegas, NV  89169
Telephone: (702) 862-3300
Fax: (702) 734-2722
cakridge@jonesvargas.com

Matthew T. Milone
Jones Vargas
3773 Howard Hughes Parkway
3rd Floor South
Las Vegas, NV  89169
Telephone: (702) 862-3300
Fax: (702) 734-2722
mmilone@jonesvargas.com

# EXHIBIT 1

# EXHIBIT 1



STATE OF NEVADA

## OFFICE OF THE ATTORNEY GENERAL
## BUREAU OF CONSUMER PROTECTION

555 East Washington Ave., Suite 3900
Las Vegas, Nevada 89101

CATHERINE CORTEZ MASTO
*Attorney General*

ERIC WITKOSKI
*Consumer Advocate*
*Chief Deputy Attorney General*

June 6, 2011

Arthur Lerner, Esq.
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595

Daniel A. Sasse, Esq.
Crowell & Moring LLP
3 Park Plaza, 20th Floor
Irvine, CA  92614-8505

Counsel for UnitedHealth Group Incorporated

RE:   *State of Nevada vs. UnitedHealth Group Incorporated and Sierra Health Services, Inc., Case 2:08-cv-00233-JCM-RJJ District of Nevada* and Fiserv Nevada

Arthur and Daniel,

This letter memorializes the Agreement between Plaintiff State of Nevada, through its Attorney General ("Nevada"), and Defendant UnitedHealth Group, Incorporated ("United") regarding Nevada's allegations and/or concerns that United did not comply with the Stipulated Final Judgment ("Judgment") and the Hold Separate and Asset Preservation Stipulation and Order ("Order") entered in the above case.

### Settlement Agreement ("Agreement")

## A.    Allegations

UnitedHealth Group Incorporated
June 6, 2011
Page 2

1.      In 2007 and early 2008, Nevada investigated United's proposed acquisition of Sierra Health Services, Inc. ("Sierra") to determine whether this acquisition violated federal and state antitrust laws.  Nevada and United negotiated a resolution regarding the United/Sierra transaction which resulted in Nevada commencing the above action on February 25, 2008. The United States District Court District of Nevada ("Court") approved the Order on March 7, 2008 and the Judgment on October 8, 2008.  Pending their approval, United agreed to comply with the Order and Judgment.

2.      During Nevada's United/Sierra transaction investigation, United acquired Fiserv, Inc.'s health-related businesses ("Fiserv Health").  Fiserv Health offered, among other services, third party administration to self-funded employers in processing the health care provider claims incurred by the employers' employees as part of an employee benefits package.  As a result of the Fiserv Health transaction, United became one of the largest third party administrators for such services in the United States.  Nevada's concerns about the competitive effects of the Fiserv Health transaction in the State of Nevada were addressed by United's proposal that the United/Fiserv Health transaction exclude Fiserv Health's assets (e.g. customer accounts) that had a Nevada situs.  The Nevada book of business was to be held by Fiserv Nevada, Inc. ("Fiserv Nevada"), a subsidiary of Fiserv, Inc.; an administrative services agreement was also entered between United and Fiserv Nevada which permitted United to assist Fiserv Nevada with the services Fiserv Nevada provided to its customers.  Nevada required assurance that United would not acquire or merge with Fiserv Nevada, and additional restrictions on joint venture activity. The final language that Nevada and United agreed to on these points was reflected as Section XI(M) in the United/Sierra Judgment as follows:

> "Defendants are prohibited from acquiring an interest in, entering into a joint venture which would result in integration of assets or operations in whole or in part of, or merging with, Fiserv Nevada.  This provision shall not prohibit maintenance and performance of any agreement for the performance of administrative services by Defendants for Fiserv Nevada."

The United/Sierra Judgment also provided that Nevada could investigate and initiate a Court proceeding alleging that United did not comply with any term specified in the Judgment or Order, including the Judgment term involving Fiserv Nevada above.

3.      In September 2009, after learning that one or more Fiserv Nevada customer accounts were transferred to United's Fiserv Health subsidiary (since renamed UMR, Inc. or "UMR"), Nevada initiated an investigation of United's compliance with the Judgment's Fiserv Nevada restriction.  United cooperated during the investigation, which included Nevada's review of about 80,000 pages of relevant documents from

UnitedHealth Group Incorporated
June 6, 2011
Page 3

United and third parties, economic analysis, and many interviews. As a result of this investigation, Nevada alleges that United, through its UMR subsidiary, did not comply with the Fiserv Nevada Judgment term, and further alleges the following:

    a. United acquired, through a series of assignments, all but one of Fiserv Nevada's active customer accounts; moreover, United exerted near total control on all of these accounts before the assignments occurred, which confused Fiserv Nevada's customers and exceeded the scope of the administrative services agreement between United and Fiserv Nevada;

    b. United acquired or controlled all of Fiserv Nevada's employees;

    c. United acquired virtually all of Fiserv Nevada's other assets, including Fiserv Nevada's office space, equipment, and data;

    d. As a result of these efforts, Fiserv Nevada ceased to do business, as demonstrated by Fiserv Nevada surrendering its license to perform third party administration of insurance in the State of Nevada.

4. Furthermore, the alleged acquisition, merger, and/or joint venture efforts by United began shortly after Nevada commenced the United/Sierra action on February 25, 2008. United completed these efforts by late 2008. Therefore, United's assertion to Nevada that United would not acquire, merge with, or engage in certain joint venture activities with Fiserv Nevada was allegedly not true.

5. Moreover, through the investigation of United's compliance with the Judgment involving Fiserv Nevada, Nevada examined these additional compliance issues with the Judgment and Order:

    a. The coordination of marketing and sales efforts between UMR and Sierra in early 2008, which may have been inconsistent with the Order;

    b. Potential inappropriate use of confidential data belonging to Fiserv Nevada's customers by UMR for marketing and sales purposes, which may have facilitated United's alleged acquisition, merger, and/or joint venture efforts of or with Fiserv Nevada;

    c. Whether there were incomplete certifications of compliance with the Judgment involving the Fiserv Nevada term.

**B.**     **Agreement**

UnitedHealth Group Incorporated
June 6, 2011
Page 4

Nevada and United agree as follows, which Nevada finds is in the public interest:

1.      This Agreement is entered into voluntarily and for the purpose of resolving Nevada's claims relating to the information contained in Section A of this Agreement. However, United denies it violated the Judgment and Order as alleged in Section A of this Agreement.

2.      Payment: United will pay Nevada a monetary settlement, inclusive of penalties and fines and exclusive of fees and costs (including attorneys fees), in the amount of $1,000,000.00, to resolve the matters covered by this Agreement.  Payment shall be made within twenty (20) days of the Court's entry of the Amended Judgment referred to in Paragraph B(3) below.  Payment of fees and costs shall be made pursuant to Judgment term Section XI(N), and in accordance with the fee schedule in effect prior to entry of the Amended Judgment (as defined below).

3.      Amended Judgment: United consents to the filing and the Court's entry of an Amended Judgment in *State of Nevada vs. UnitedHealth Group Incorporated and Sierra Health Services, Inc., Case 2:08-cv-00233-JCM-RJJ District of Nevada* ("Amended Judgment"), attached as Exhibit A to this Agreement.  United also agrees to comply with any amendments to the Judgment after United's execution of this Agreement, but prior to the entry of the Amended Judgment by the Court.  By way of summary only, the amendments are as follows:

   a.  Removal of the Fiserv Nevada restrictions given Nevada's assertion that its prohibitions have been made moot (Section XI(M));

   b.  Extended notification of proposed acquisitions or mergers by United which significantly involve Nevada health care markets (Section XI(K));

   c.  Modified confidentiality policies regarding the protection of proprietary rate information and other confidential data belonging to customers of United based in Nevada (Section XI(D));

   d.  Extended and modified annual compliance reporting, including submission of certifications under oath that any reports are accurate, complete, and do not omit information reasonably calculated to inform Nevada of United's compliance or non-compliance (Section XIII(C));

   e.  Extended and modified compliance investigation procedures, including compliance reporting at Nevada's request, an increase of the hourly rate for

UnitedHealth Group Incorporated
June 6, 2011
Page 5

investigative fees, and changes to the meet and confer process prior to Nevada instituting a Court proceeding involving a Judgment violation (Sections XIII(D), XI(N), XII(F));

f.  Clarifying that monetary awards resulting from Court proceedings interpreting Judgment violations, as well as resolutions of compliance investigations, shall be provided to any of the Judgment's existing Charitable Contribution grants, or any government or non-profit health related program in the State of Nevada (Section XII(E));

g.  Additional clarification of Judgment terms, including United's duties when it cooperates with the Nevada Governor's Office of Consumer Health Assistance and the scope of certain Charitable Contribution grants (Section XI(H), Schedule A to Exhibit C).

4.      Release: Upon the Court's entry of the Amended Judgment attached as Exhibit A to this Agreement and upon receipt of the $1,000,000.00 payment described in Paragraph B(2) above, Nevada shall be deemed to have released, and to have agreed not to pursue further any claim against United, including any of its officers, directors, shareholders, parents, subsidiaries, business units, affiliates, agents, representatives, predecessors, successors, and assigns, and any of its former or current employees, relating to any information, compliance issues, or allegations reflected in Section A of this Agreement.  Moreover, any pending investigation relating to any information or compliance issues reflected in Section A of this Agreement shall be deemed closed with respect to United, including any of its officers, directors, shareholders, parents, subsidiaries, business units, affiliates, agents, representatives, predecessors, successors, and assigns, and any of its former or current employees.

5.      General Provisions

a.  This Agreement does not confer any rights upon any persons or entities other than Nevada and United and its affiliates.

b.  United consents to the jurisdiction of the state courts of Nevada to enforce this Agreement, and agrees that State of Nevada laws apply to the interpretation of this Agreement.  The exception to state court jurisdiction is that jurisdiction resides with the Court for any action which relates to enforcement or interpretation of the Amended Judgment or defenses/waivers which arise from the releases in Section B(4) of this Agreement.  Nevada and United agree to comply with Amended Judgment Sections XIII(F) and XII(F) prior to any Court

UnitedHealth Group Incorporated
June 6, 2011
Page 6

enforcement action involving this Agreement. As part of any future court action, Nevada and United consent that the court shall have the authority to award equitable relief, including specific performance, but not damages against Nevada. Also, if any part of this Agreement is adjudged by a court to be unenforceable, the remaining provisions of this Agreement shall stay in full force and effect.

c. This Agreement may be modified by the mutual agreement of Nevada and United. Any modification shall be in writing and signed by authorized designated representatives of Nevada and United.

d. This Agreement may be executed in counterparts.

Sincerely,

CATHERINE CORTEZ MASTO, Attorney General
ERIC WITKOSKI, Consumer Advocate

By: _____
BRIAN ARMSTRONG, Senior Deputy Attorney General

AGREED: UnitedHealth Group Incorporated

Date: _____

By: _____

Name: Arthur Lerner, Counsel to United Health Group Incorporated.

Title: Partner, Crowell & Moring LLP

# EXHIBIT A

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

---

**THE STATE OF NEVADA by its ATTORNEY
GENERAL CATHERINE CORTEZ MASTO;**

    Plaintiff,

    v.

**UNITEDHEALTH GROUP INCORPORATED and
SIERRA HEALTH SERVICES, INC.,**

    Defendants.

---

Case No. 2:08-cv-00233-JCM-(RJJ)

## <u>AMENDED FINAL JUDGMENT</u>

WHEREAS, Plaintiff, State of Nevada through its Attorney General, filed its

Complaint on February 25, 2008; Plaintiff and Defendants (collectively, the "Parties"),

UnitedHealth Group Incorporated and Sierra Health Services, Inc. (defined herein and

collectively referred to as "Defendants") by their respective attorneys, have consented to

the entry of this Final Judgment without trial or adjudication of any issue of fact or law

and without this Final Judgment constituting any evidence against or admission by any

party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of the Final

Judgment and this Amended Final Judgment pending the entry of the Amended Final

Judgment by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain

Divestiture of certain rights or assets by Defendants to ensure that competition is not

substantially lessened and to ensure that Defendants will abide by other conditions herein

1 – Amended Final Judgment

to facilitate and expand the scope of health care coverage and insurance to the people and businesses of Nevada;

AND WHEREAS, Plaintiff requires Defendants to make a certain Divestiture and agree to other provisions identified herein for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have entered into a similar judgment with the United States Department of Justice Antitrust Division to address the same allegations set forth by the Nevada Attorney General in its complaint;

AND WHEREAS, Defendants have represented to the Nevada Attorney General that the Divestiture required by this Final Judgment and other terms and conditions identified herein can and will be made, and that Defendants will not later raise any claims of hardship or difficulty as grounds for asking the Court to modify any of the provisions of this Final Judgment;

AND WHEREAS, the Parties consent to entry of this Amended Final Judgment in resolution of Plaintiff's alleged violations and concerns regarding the Final Judgment, which Defendants dispute, and to clarify certain terms;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the Parties, it is ORDERED, ADJUDGED, AND DECREED:

## I.  JURISDICTION

This Court has jurisdiction over the subject matter of, and each of the Parties to, this action.  The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

2 – Amended Final Judgment

## II.  **DEFINITIONS**

As used in this Amended Final Judgment:

A.      "Acquirer" means the entity to whom the Divestiture Assets are divested.

B.      "All Products Provision" means any policy, practice, rule, contract provision, financial incentive, compensation package, or reimbursement rate(s) that coerces or otherwise requires a Health Care Provider to involuntarily participate in any of Defendants' networks  in Nevada by conditioning such participation upon a Health Care Provider's participation in other of Defendants' networks using different compensation terms and/or conditioning a Health Care Provider's participation in commercial products on participation in Medicare Advantage products or vice versa.

C.      "Clark County" means the Las Vegas-Paradise Metropolitan Statistical Area consisting of Clark County, Nevada.

D.      "Clark County CMS Plans" means the individual Medicare Advantage plans offered under CMS Plan Nos. H2949-002, H2949-009 and H2949-012, but does not include any Series 800 Medicare Advantage plans offered to retirees through commercial customers or contracts.

E.      "Clark and Nye County CMS Plans" means the Clark County CMS Plans and the Nye County CMS Plans.

F.      "CMS" means the Centers for Medicare and Medicaid Services, an agency within the U.S. Department of Health and Human Services.

G.      "Divestiture," "Divest," or "Divesting" means the sale, transfer, ceding, assignment or disposition of the beneficial interest in the Divestiture Assets by commercially reasonable means in accordance with applicable law.

H.     "Divestiture Assets" means all tangible and intangible assets dedicated to the administration, operation, selling, and marketing of the Clark and Nye County CMS Plans, including (1) all of United's rights and obligations under United's Medicare Contract No. H2949 with CMS relating to the Clark and Nye County CMS Plans, including the right to offer the Medicare Advantage plan to individual enrollees pursuant to the bids and Evidence of Coverage filed with CMS in 2007 for the 2008 contract year, and the right to receive from CMS a per member per month capitation payment in exchange for providing or arranging for the benefits enumerated in the bids and Evidence of Coverage, and (2) copies of all business, financial and operational books, records, and data, both current and historical, that relate to the Clark County CMS Plans or the Nye County CMS Plans.  Where books, records, or data relate to the Clark County CMS Plans or the Nye County CMS Plans, but not solely to these Plans, United shall provide excerpts relating to these Plans.  Nothing herein requires United to take any action prohibited by the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

I.     "Divestiture Costs" means costs, expenses or distributions related to, associated with, or concerning the Divestiture Assets.

J.     "Evidence of Coverage" means the document that outlines an enrollee's benefits and exclusions under a Medicare Advantage Plan.

K.     "HealthCare Partners" means JSA Healthcare Nevada, LLC, a Nevada limited liability company, and its affiliated entities, including HealthCare Partners, LLC and Summit Medical Group.

L.     "Health Care Provider" means any direct provider of health care to patients in Nevada including, but not limited to, hospitals, physicians, physician groups,

assisted living facilities, ambulatory surgery centers, out-patient facilities, nursing homes, and skilled nursing facilities.

M.     "Humana" means Humana Inc., a Delaware corporation with its headquarters in Louisville, Kentucky.

N.     "Intentional" means willful or reckless action or omission.

O.     "Judgment," "Final Judgment," or "Amended Final Judgment" means this Amended Final Judgment, except as the context may require otherwise that it mean the preceding Stipulated Final Judgment entered by the Court on October 8, 2008.

P.     "Las Vegas Area" means Clark County and Nye County.

Q.     "Medicare Advantage Line of Business" means the operations of United that implement and administer the Clark and Nye County CMS Plans.

R.     "Medicare Advantage Plan" means Medicare Advantage health maintenance organization plans, Medicare Advantage preferred provider organization plans, and Medicare Advantage private fee-for-service plans as defined by 42 U.S.C. Section 1395 w-21(a)(2).

S.     "Medical Specialty" means a field of medical practice defined by recognition within a separate specialty board by the American Board of Medical Specialties, provided that internal medicine, family practice and general practice shall be considered a single Medical Specialty, excluding sub-specialties, for purposes of this Judgment.

U.     "Most Favored Nation Clause" means any policy, practice, rule, or contractual provision which (1) requires a Health Care Provider to charge any Third Party Payer as much as or more than the rate charged to Defendants by such Health Care

Provider for the same type of health benefit program or any given service (as defined by said policy, practice rule, or contractual provision), or (2) requires a Health Care Provider to charge Defendants rates equal to or lower than the lowest rate it charges any Third Party Payer for the same type of health benefit program or any given service (as defined by said policy, practice rule, or contractual provision).

V.       "National Provider" shall mean a provider or provider organization under contract for the provision of services to enrollees of affiliates of United/Sierra in multiple states whose share of revenues earned as a result of such services delivered to Nevada residents does not exceed 35 percent of its total revenues from United/Sierra, with service delivery capability in multiple states, regardless of whether any such provider or provider organization is based in Nevada or otherwise provides services to enrollees in Nevada.

W.       "Nevada Attorney General" collectively refers to Attorney General Catherine Cortez Masto and Nevada Consumer Advocate Eric Witkoski, and their legally elected or appointed successors in office.

X.       "Nevada Transactions" shall mean all mergers, acquisitions, or other transactions resulting in the Defendants' acquisition of a controlling interest in any of the following entities doing business in Nevada: health insurers (including HMOs and PPOs); hospitals, institutional health care providers, ambulatory surgery centers, assisted living facilities, or skilled nursing facilities;   physician groups if the acquired group represents more than 10% of all practitioners providing services in at least one Medical Specialty within (1) Clark and Nye Counties (2) Washoe and Carson Counties, or (3)  the remainder of the Nevada;  any other Health Care Provider in which the value of the

6 –Amended Final Judgment

Nevada portion of the transaction is $30 million or more; or third party administrators (TPA) which have at least 35% of their revenues in Nevada.

      Y.     "Nye County" means that county located adjacent to, and northwest of, the Metropolitan Statistical Area consisting of Clark County, Nevada and having Tonopah as its County seat.

      Z.     "Nye County CMS Plans" means the individual Medicare Advantage plans offered under CMS Plan Nos. H2949-007 and H2949-011, but does not include any Series 800 Medicare Advantage plans offered to retirees through commercial customers or contracts.

      AA.     "PIPA" means The Physicians IPA, Inc., a Nevada non-profit corporation based in Las Vegas, Nevada.

      BB.     "Provider Network" means all Health Care Providers, including physicians, hospitals, ancillary service providers, and other Health Care Providers with which United contracts for the provision of covered medical services for United's Medicare Advantage Plans in the Las Vegas Area.

      CC.     "Sierra" means Defendant Sierra Health Services, Inc., a Nevada corporation with its headquarters in Las Vegas, Nevada, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their respective directors, officers, managers, agents, and employees.

      DD.     "Southwest Medical Associates, Inc." ("SMA") means a multi-specialty medical group practice owned by Sierra Health Services, Inc., its operations and any physician or other Health Care Provider employed by or contracted with SMA.  For

7 –Amended Final Judgment

purposes of this Judgment, the term SMA shall also include any related companies owned directly or indirectly by the same parent company which directly provide health care services.

      EE.    "Small Group Employer" means an entity that is based in Nevada, has its principal place of operation in Nevada, and meets the definition of "small employer" at NRS § 689C.095.

      FF.    "Transaction" means the merger contemplated by the Agreement and Plan of Merger dated as of March 11, 2007, by and among United, Sapphire Acquisition, Inc. and Sierra.

      GG.    "Third Party Payer" means any government, public and non-governmental entity including but not limited to the Nevada Public Employees' Benefit Program, but other than Defendants, the Centers for Medicare and Medicaid Services or Medicaid, that pays for all or part of any expense for health care services provided by a Health Care Provider to another person or group of persons in Nevada.

      HH.    "UMC" means the University Medical Center of Southern Nevada.

      II.    "United States" means the United States Department of Justice Antitrust Division.

      JJ.    "United" means Defendant UnitedHealth Group Incorporated, a Minnesota corporation with its headquarters in Minnetonka, Minnesota, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their respective directors, officers, managers, agents, and employees.

## III.  APPLICABILITY

A.      The Final Judgment or this Amended Final Judgment applies to United and Sierra, and to all other persons in active concert or participation with any of them who receive actual notice of the Final Judgment or this Amended Final Judgment by personal service or otherwise.

B.      If, prior to complying with Section IV and VI of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of this Final Judgment.  Defendants need not obtain such an agreement from the Acquirer of the assets divested pursuant to this Final Judgment.

## IV.  DIVESTITURE OF THE DIVESTITURE ASSETS

A.      Defendants are ordered, within forty-five (45) calendar days after the filing of the Complaint in this matter, to divest the Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer acceptable to the Nevada Attorney General and United States and on terms acceptable to the Nevada Attorney General and the United States in their discretion, including any agreement for transitional support services entered into pursuant to Section IV(J) of this Final Judgment.  The Nevada Attorney General and the United States may, in their discretion, grant one or more extensions of this time period, not to exceed sixty (60) calendar days in total, and shall notify the Court in each such circumstance.  Defendants shall accomplish the divestiture of the Divestiture Assets as expeditiously as possible and in such a manner as will allow the Acquirer to be a viable, ongoing business engaged in the sale of Medicare Advantage Plans in the Las Vegas Area.

9 –Amended Final Judgment

B.     If applications for approval have been filed with CMS and the appropriate other governmental units within twenty (20) calendar days after the filing of the Complaint in this matter, but these required approvals have not been issued before the end of the period permitted for Divestiture in Section IV(A), the Nevada Attorney General and the United States may extend the period for Divestiture until five (5) business days after all necessary government approvals have been received.

C.     The Divestiture shall be accomplished in such a way as to satisfy the Nevada Attorney General and the United States that the Divestiture Assets can and will be used by the Acquirer as part of a viable, ongoing business engaged in the sale of Medicare Advantage Plans in the Las Vegas Area.  Defendants must demonstrate to the sole satisfaction of the Nevada Attorney General that the Divestiture will remedy the competitive harm alleged in the Complaint.  The Divestiture shall be:

(1)     made to an Acquirer that, in the Nevada Attorney General's judgment, has the intent and capability (including the necessary managerial, operational, technical, and financial capability) to compete effectively in the sale of Medicare Advantage Plans in the Las Vegas Area; and

(2)     accomplished so as to satisfy the Nevada Attorney General that none of the terms of any agreement between Defendants and the Acquirer gives Defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere with the Acquirer's ability to compete effectively.

D.     Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divestiture Assets.

E.      Defendants shall provide to the Acquirer, the Nevada Attorney General, and any Monitoring Trustee, information relating to the personnel primarily involved in the operation of the Divestiture Assets to enable the Acquirer to make offers of employment to those persons.  Defendants shall not interfere with any negotiations by the Acquirer to employ any of those persons.  For a period of two (2) years from the filing of the Complaint in this matter, Defendants shall not hire or solicit to hire any such person who was hired by the Acquirer, unless the Acquirer has notified such person that the Acquirer does not intend to continue to employ the person.

F.      Defendants shall assist the negotiation of and entry into agreement(s) between the Acquirer and HealthCare Partners that will allow members of the Clark and Nye County CMS Plans to have continued access to substantially all of United's Provider Network as of January 2008 on terms no less favorable than United's agreements as of January 2008.

G.      Upon completing the Divestiture and through March 31, 2010, Defendants shall have no agreements with HealthCare Partners or PIPA that provide for access by United to HealthCare Partners or PIPA in connection with enrollees in any type of individual Medicare Advantage plan of Defendants in the Las Vegas Area.

H.      Upon completing the Divestiture and through March 31, 2009, Defendants shall not use the AARP brand, or any other substantially similar brand, name, or logo, for any type of individual Medicare Advantage plan of Defendants in the Las Vegas Area. Upon completing the Divestiture and through March 31, 2010, Defendants shall not use the SecureHorizons brand, or any other substantially similar brand, name, or logo, for any type of individual Medicare Advantage plan of Defendants in the Las Vegas Area.

11 –Amended Final Judgment

I.      At the Acquirer's option, and subject to approval by the Nevada Attorney General, Defendants will allow the Acquirer to license and use the SecureHorizons brand, and any other substantially similar brand, name, or logo, with the Divestiture Assets for twelve months upon completing the Divestiture.

J.      At the Acquirer's option, and subject to approval by the Nevada Attorney General, Defendants will provide transitional support services for medical claims processing, appeals and grievances, call-center support, enrollment and eligibility services, access to form templates, pharmacy services, disease management, Medicare risk-adjustment services, quality-assurance services, and such other transition services that are reasonably necessary for the Acquirer to operate the Divestiture Assets. Defendants shall not provide such transitional support services for more than twelve months from the date of the completion of the Divestiture unless the Nevada Attorney General shall otherwise approve.

K.      To ensure an effective transition and transfer of enrollees in the Clark and Nye County CMS Plans to the Acquirer, Defendants shall cooperate and work with the Acquirer in transition planning and implementing the transfer of the Divestiture Assets.

L.      Defendants will communicate and cooperate fully with the Acquirer to promptly identify and obtain all consents of government agencies necessary to divest the Divestiture Assets.

M.      Defendants will communicate and cooperate fully with the Acquirer to work in good faith with CMS to select a novation process that is efficient and minimizes any potential disruption and confusion to enrollees in the Clark and Nye County CMS Plans.

N.     United shall warrant to the Acquirer that, since January 1, 2007, except for the global capitation agreement entered into between United and HealthCare Partners, United has operated the Divestiture Assets in all material respects in the ordinary course of business consistent with past practices and that there has not been (a) any material loss or change with respect to the Divestiture Assets; (b) any event, circumstance, development, or change that has had a material adverse effect on the Divestiture Assets; or (c) any change by United of its accounting or actuarial methods, principles, or practices that is relevant to the Divestiture Assets.

O.     Defendants shall comply with all laws applicable to the Divestiture Assets.

P.     Defendants shall not take any action having the effect of delaying the authorization or scheduling of health care services provided to enrollees in the Clark and Nye County CMS Plans in a manner inconsistent with Defendants' past practice with respect to the Clark and Nye County CMS Plans.

Q.     Defendants shall not make any material change to the customary terms and conditions upon which it does business with respect to the Medicare Advantage Line of Business that would be expected, individually or in the aggregate, to have a materially adverse effect on the Medicare Advantage Line of Business.

R.     United shall identify its top ten independent insurance agents, general agents, producers, and brokers (collectively, "Brokers") that have entered into a Broker contract with respect to the Medicare Advantage Line of Business along with the corresponding number of enrollees produced by each such Broker.  United will introduce the Acquirer to any such Broker for the purpose of the Acquirer having an opportunity, at

the Acquirer's option, to negotiate an agreement with the Broker to market and sell the

Clark and Nye County CMS Plans after the completion of the Divestiture.

      S.      Defendants shall first attempt to sell the Divestiture Assets to Humana.

      T.      If Defendants fail to divest the Divestiture Assets by May 15, 2008, at the

discretion of the Nevada Attorney General and the United States, United shall be required

to submit all necessary filings to CMS to ensure that the Divestiture Assets remain a

viable, ongoing business, offering the same Medicare Advantage Plans that United

offered in 2008 with comparable benefits and premiums.

## V.   **APPOINTMENT OF MONITORING TRUSTEE**

      A.      Upon the filing of this Final Judgment, the Nevada Attorney General may

consult with the United States in the appointment of a Monitoring Trustee, subject to

approval by the Court.

      B.      The Monitoring Trustee shall have the power and authority to monitor

Defendants' compliance with the terms of this Final Judgment and the Hold Separate and

Asset Preservation Stipulation and Order entered by this Court and shall have such

powers as this Court deems appropriate.  Subject to Section V(D) of this Final Judgment,

the Monitoring Trustee may hire at the cost and expense of United any consultants,

accountants, attorneys, or other persons, who shall be solely accountable to the

Monitoring Trustee, reasonably necessary in the Monitoring Trustee's judgment.

      C.      Defendants shall not object to actions taken by the Monitoring Trustee in

fulfillment of the Monitoring Trustee's responsibilities under any Order of this Court on

any ground other than the Monitoring Trustee's malfeasance.  Any such objections by

Defendants must be conveyed in writing to the Nevada Attorney General and the

Monitoring Trustee within ten (10) calendar days after the action taken by the Monitoring

Trustee giving rise to the Defendants' objection.

     D.     The Monitoring Trustee shall serve at the cost and expense of United, on

such terms and conditions as the Nevada Attorney General approves.  The compensation

of the Monitoring Trustee and any consultants, accountants, attorneys, and other persons

retained by the Monitoring Trustee shall be on reasonable and customary terms

commensurate with the individuals' experience and responsibilities.

     E.     The Monitoring Trustee shall have no responsibility or obligation for the

operation of Defendants' businesses.

     F.     Defendants shall assist the Monitoring Trustee in monitoring Defendants'

compliance with their individual obligations under this Final Judgment and under the

Hold Separate and Asset Preservation Stipulation and Order.  The Monitoring Trustee

and any consultants, accountants, attorneys, and other persons retained by the Monitoring

Trustee shall have full and complete access to the personnel, books, records, and facilities

relating to the Divestiture Assets, subject to reasonable protection for trade secret or other

confidential research, development, or commercial information or any applicable

privileges.  Defendants shall take no action to interfere with or to impede the Monitoring

Trustee's accomplishment of its responsibilities.

     G.     After its appointment, the Monitoring Trustee shall file monthly reports

with the Nevada Attorney General and the Court setting forth the Defendants' efforts to

comply with their individual obligations under this Final Judgment and under the Hold

Separate and Asset Preservation Stipulation and Order.  To the extent such reports

15 –Amended Final Judgment

contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court.

H. The Monitoring Trustee shall serve until the divestiture of all the Divestiture Assets is finalized pursuant to either Section IV or Section VI of this Final Judgment and any agreement(s) for transitional support services described in Section IV(J) herein have expired.

## VI. APPOINTMENT OF TRUSTEE

A. If Defendants have not divested the Divestiture Assets within the time period specified in Section IV(A), Defendants shall notify the Nevada Attorney General of that fact in writing. Upon application of the Nevada Attorney General, the Court shall appoint a trustee selected by the Nevada Attorney General and the United States and approved by the Court to effect the divestiture of the Divestiture Assets.

B. After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the Divestiture Assets. The trustee shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the Nevada Attorney General and the United States at such price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, VI, and VII of this Final Judgment, and shall have such other powers as this Court deems appropriate. Subject to Section VI(D) of this Final Judgment, the trustee may hire at the cost and expense of Defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

C.     Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance.  Any such objections by Defendants must be conveyed in writing to the Nevada Attorney General and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VII.

D.     The trustee shall serve at the cost and expense of Defendants, on such terms and conditions as the Nevada Attorney General and the United States approve, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred.  After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to Defendants and the trust shall then be terminated.  The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E.     Defendants shall assist the trustee in accomplishing the required divestiture.  The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities relating to the Divestiture Assets, and Defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information.  Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

F.      After its appointment, the trustee shall file monthly reports with the Nevada Attorney General and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment.  To the extent that such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court.  Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person.  The trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G.      If the trustee has not accomplished the divestiture ordered under this Final Judgment within six months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished, and (3) the trustee's recommendations.  To the extent that such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court.  The trustee shall at the same time furnish such report to the Nevada Attorney General which shall have the right to make additional recommendations consistent with the purpose of the trust.  The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the Nevada Attorney General.

## VII. <u>NOTICE OF PROPOSED DIVESTITURE</u>

A.      Within two (2) business days following execution of a definitive

divestiture agreement, Defendants or the trustee, whichever is then responsible for

effecting the divestiture required herein, shall notify the Nevada Attorney General and

any Monitoring Trustee of any proposed divestiture required by Section IV or VI of this

Final Judgment.  If the trustee is responsible, it shall similarly notify Defendants.  The

notice shall set forth the details of the proposed divestiture and list the name, address, and

telephone number of each person not previously identified who offered or expressed an

interest in or desire to acquire any ownership interest in the Divestiture Assets, together

with full details of the same.

B.      Within fifteen (15) calendar days of receipt by the Nevada Attorney

General of such notice, the Nevada Attorney General may request from Defendants, the

proposed Acquirer, any other third party, or the trustee, if applicable, additional

information concerning the proposed divestiture, the proposed Acquirer, and any other

potential Acquirer.  Defendants and the trustee shall furnish any additional information

requested within fifteen (15) calendar days of the receipt of the request, unless the parties

shall otherwise agree.

C.      Within thirty (30) calendar days after receipt of the notice or within twenty

(20) calendar days after the Nevada Attorney General has been provided the additional

information requested from Defendants, the proposed Acquirer, any third party, and the

trustee, whichever is later, the Nevada Attorney General shall provide written notice to

Defendants and the trustee, if there is one, stating whether or not it objects to the

proposed divestiture.  If the Nevada Attorney General provides written notice that it does

19 –Amended Final Judgment

not object, the divestiture may be consummated, subject only to Defendants' limited right to object to the sale under Section VI(C) of this Final Judgment. Absent written notice that the Nevada Attorney General does not object to the proposed Acquirer or upon objection by the Nevada Attorney General and the United States, a divestiture proposed under Section IV or Section VI shall not be consummated. Upon objection by Defendants under Section VI(C), a divestiture proposed under Section VI shall not be consummated unless approved by the Court.

## VIII.  FINANCING

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or VI of this Final Judgment.

## IX.  HOLD SEPARATE AND PRESERVATION OF ASSETS

Until the divestiture required by this Final Judgment has been accomplished, Defendants shall take all steps necessary to comply with the Hold Separate and Asset Preservation Stipulation and Order entered by this court. Defendants shall take no action that will jeopardize any divestiture ordered by this Court.

## X.  AFFIDAVITS AND RECORDS

A.  Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV or VI, Defendants shall deliver to the Nevada Attorney General and any Monitoring Trustee an affidavit as to the fact and manner of its compliance with Section IV or VI of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in

acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts Defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Assuming that the information set forth in the affidavit is true and complete, any objection by the Nevada Attorney General to information provided by Defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.    Within twenty (20) calendar days of the filing of the Complaint in this matter, Defendants shall deliver to the Nevada Attorney General and any Monitoring Trustee an affidavit that describes in reasonable detail all actions that Defendants have taken and all steps that Defendants have implemented on an ongoing basis to comply with Section IX of this Final Judgment. Defendants shall deliver to the Nevada Attorney General and any Monitoring Trustee an affidavit describing any changes to the efforts and actions outlined in Defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.    Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestiture has been completed.

## XI.  OTHER TERMS AND CONDITIONS

### A.    ALL PRODUCTS PROVISIONS

1.      From entry of the Judgment and for two (2) years thereafter, Defendants shall not place an All Products Provision in a Health Care Provider contract or impose or enforce an existing All Products Provision in Defendants' contracts and/or Defendants' business relationships with Health Care Providers with respect to health care services provided in Nevada.

2.      Defendants may require and enforce All Products Provisions with SMA and any National Provider.

**B.      MOST FAVORED NATION CLAUSES**

1.      From entry of this Judgment and for two (2) years thereafter, Defendants are prohibited from adopting, maintaining, or enforcing a Most Favored Nation Clause in Defendants' contracts or Defendants' business relationships with Health Care Providers with respect to health care services in Nevada.

2.      Notwithstanding the general prohibition set forth in Section XI B(1), Defendants may maintain and enforce Most Favored Nation Clauses in existing physician services and non-acute care hospital contracts, information on which has been confidentially provided in good faith to the Nevada Attorney General and may be augmented by Defendants as information comes to their attention, provided, however, that upon termination of such contracts, the new contracts for those Health Care Providers shall not contain Most Favored Nation Clauses in such contracts for a period of two (2) years from termination of the contract(s).  If such new contracts have an effective date prior to the expiration of this Amended Final Judgment, these contracts shall not contain Most Favored Nation Clauses for a period of two (2) years from the new

22 –Amended Final Judgment

contracts' effective date even if part of this period extends beyond the expiration date of this Amended Final Judgment.

    3.  Defendants may require and enforce Most Favored Nation Clauses in contracts with SMA and National Providers.

### C.    EXCLUSIVE AGREEMENTS

    1.    From entry of this Judgment and for two (2) years thereafter, Defendants shall not, in violation of state or federal antitrust law, enter into exclusive agreements with Health Care Providers or adopt or otherwise enforce contract provisions, policies, rules, or requirements when the purpose or effect of such agreements, provisions, policies, rules, or requirements is to require Health Care Providers to provide all, or substantially all, of their services in Nevada to, and under, Defendants' health care networks or product offerings.

    2.    This provision does not apply to agreements with SMA, National Providers, and current agreements with Health Care Providers, until such current agreements with Health Care Providers expire.

### D.    PROPRIETARY INFORMATION

    1.    Upon entry of this Judgment, Defendants are prohibited from adopting, maintaining, or enforcing any policy, practice, or agreement that requires a Health Care Provider to disclose to Defendants, directly or indirectly, through audit or any other means, the rates such Health Care Providers offer or charge any Third Party Payer in Nevada except in the normal course of Defendants' operation, e.g., coordination of benefits in connection with specific claims.  If such rates are disclosed by a Health Care Provider to

the Defendants in the normal course of operations, Defendants shall not use such information for the purpose of negotiating its own participating provider rates with such Health Care Providers.

2.      If, through the normal course of operations, Defendants, directly or through any affiliates, obtain access to proprietary and confidential information from a self-funded employer that has employees in the State of Nevada (e.g. a government, public, or non-governmental entity including but not limited to the Nevada Public Employees' Benefit Program) and/or other third party acting on behalf of such a self-funded employer (e.g. a third party administrator) ("Nevada Self-Funded Employer") regarding Health Care Provider rates in Nevada which are negotiated and paid by such Nevada Self-Funded Employer, Defendants shall not use such information for the purpose of negotiating its own participating provider rates with such Health Care Providers.

3.      To the extent such proprietary and confidential information described in Section XI (D)(2) is required for Defendants to conduct its normal business operations, during the term of this Amended Final Judgment, Defendants shall:

a.      Hold in the strictest confidence such proprietary and confidential information regarding the Health Care Provider rates negotiated and/or paid by any Nevada Self-Funded Employer.

b.      Within forty-five (45) days from entry of this Judgment, establish appropriate safeguards in writing to ensure that such proprietary or confidential information described in this Section XI (D)(2) is not provided or made known to Defendants' employees, principals, managers, officers, directors or agents who

negotiate rates and/or are involved in the negotiation of such rates with Health
Care Providers.

       c.     Within forty-five (45) days from entry of this Judgment, establish
and enforce written protocols whereby unauthorized dissemination of such
confidential and proprietary information is retrieved and expunged from the files
of employees, principals, managers, officers, directors, and agents who are not
authorized to obtain and use such information.

       d.     Take all reasonable and necessary steps, and place all necessary
restrictions and prohibitions on its affiliates to ensure that any and all of
Defendants' affiliate(s) in possession of Health Care Provider rates described in
Section XI (D)(2) above, shall use such proprietary and confidential information
for the limited purpose of performing their obligations under the respective
agreements Defendants have with any Nevada Self-Funded Employer.

    4.     Defendants shall provide to the Nevada Attorney General true and exact
copies of the safeguards and protocols described in Section XI (D)(3)(b) and (c) herein,
including related confidentiality policies expressly referenced in the safeguards and
protocols ("Confidentiality Policies"). The Confidentiality Policies include the
Confidentiality Policy Regarding Certain Provider Rate Information in Nevada and the
UMR Data Confidentiality Policy. The Nevada Attorney General or Defendants may
request revisions to any of the Confidentiality Policies as circumstances require. Actual
modifications to the Confidentiality Policy Regarding Certain Provider Rate Information
in Nevada or the UMR Data Confidentiality Policy that relate to Defendants' obligations

25 –Amended Final Judgment

under this Amended Final Judgment are subject to the Nevada Attorney General's prior approval. Moreover, within fifteen (15) days after entry of this Amended Final Judgment, Defendants shall submit to the Nevada Attorney General for its prior approval a revised UMR Data Confidentiality Policy, making explicit that Defendants shall only use a Nevada Self-Funded Employer's confidential information (including but not limited to proprietary and confidential information as described in Section XI (D)(2) herein) as permitted under the agreement Defendants have with any Nevada Self-Funded Employer or as otherwise required by law, unless the Nevada Self-Funded Employer consents otherwise. Defendants shall work in good faith with the Nevada Attorney General to finalize and implement such revised UMR Data Confidentiality Policy within forty-five (45) days after entry of this Amended Final Judgment. However, if implementation of the revised UMR Data Confidentiality Policy has not occurred within such forty-five (45) day period, Defendants shall not be deemed in violation of this Section so long as Defendants are working in good faith with the Nevada Attorney General to accomplish such approval, finalization and implementation. Further, as identified in good faith by Defendants (including through audits performed by Defendants' UnitedHealthcare Compliance Office), Defendants shall provide written notification to the Nevada Attorney General of any instances in which unauthorized use or disclosure of proprietary and confidential information as described in Sections XI (D)(1), (2), and (3) occurred, or any material violations of the UMR Data Confidentiality Policy relating to any Nevada Self-Funded Employer. Such notifications shall be provided within twenty (20) days from the time Defendants become aware of such non-compliance and, as soon as practicable thereafter, the corrective actions taken in response thereto. The notifications

26 –Amended Final Judgment

and corrective actions shall also be reflected in any compliance reports pursuant to

Section XIII (C). Non-compliance by Defendants with the material terms of this Section

or the Confidentiality Policies relating to any Nevada Self-Funded Employer may be

deemed a violation of this Amended Final Judgment even if unauthorized use or

disclosure of proprietary and confidential information described in Section XI (D)(2)

herein is not at issue.

5.     Proprietary information does not include, however, information which (a)

is or becomes generally available to the public other than as a result of a disclosure

by Defendants, (b) was available to Defendants on a non-confidential basis prior to the

effective date of the Final Judgment or (c) becomes available to Defendants on a non-

confidential basis from a person, who to the best knowledge of the Defendants, is not

otherwise bound by a confidentiality agreement, provided that this subsection (c) shall

not apply to proprietary information that is clearly identified and marked as "Privileged,"

"Confidential," or "Proprietary," or otherwise contains the indicia of proprietary or

confidential information regardless of the manner in which such information is obtained

by Defendants.

### E.     NOTICE TO SMALL GROUP EMPLOYERS

Defendants shall provide notice to Small Group Employers of their intent to raise

rates at least sixty (60) days in advance of a rate increase and shall provide Small Group

Employers with the ability to terminate or cancel their contracts without penalty for such

termination or cancellation.

### F.     UNIVERSITY MEDICAL CENTER

27 –Amended Final Judgment

A binding Commitment Letter to University Medical Center on issues relating to contract maintenance at status quo, resolution of outstanding billing disputes, and commitment to a streamlined process for billing dispute resolution is attached hereto as Exhibit A and incorporated herein by this reference. This Commitment Letter shall be enforceable through this Amended Final Judgment by the Nevada Attorney General. All remedies described herein shall be available to the Nevada Attorney General in seeking compliance and enforcement of Exhibit A or any part thereof, or penalties for Defendants' failure to comply with Exhibit A. Exhibit A shall also be made part of a contract addendum on the current contracts between United and UMC and Sierra and UMC.

### G.      PROHIBITION AGAINST COST PASS THROUGH

Premiums payable by United and Sierra individual and group members or contract holders shall not increase, nor shall fees paid to participating providers decrease, as a result of costs associated with the Transaction.

### H.      HEALTH CARE ADVOCACY AND ASSISTANCE PROGRAM

1.      Defendants shall cooperate with the Governor's Office for Consumer Healthcare Assistance ("GOVCHA") in the development and expansion of its healthcare advocacy and assistance programs, pursuant to GOVCHA's duty to assist consumers in understanding their rights and responsibilities under health care plans, provide information to consumers concerning health care plans, identify and investigate complaints of consumers regarding their health care plans, and assist consumers to

resolve their complaints, pursuant to NRS 223.500 et seq. This cooperation includes, but is not limited to:

a. Engaging in reasonable and good faith efforts with GOVCHA, at its request, to address complaints of consumers (including Small Group Employers and their employees) regarding Defendants' health care plans provided to such consumers;

b. Engaging in reasonable and good faith efforts with GOVCHA, at its request, to assess the need for changes in existing protocols, guidelines, and/or benchmarks for (1) resolution of disputes between Defendants and their consumers (including Small Group Employers and their employees) relating to insurance coverage, claims, timing of claims payments, and reimbursements under Defendants' health care plans; and (2) reviewing claims, claims payments, including the timing of such claims payments, and dispute resolution involving Defendants and their consumers (including Small Group Employers and their employees); and if deemed warranted by GOVCHA and Defendants (taking into account, among other things, any difference in cost or impact on business operations that may thereby result as between Defendants and other similarly situated entities), developing or modifying such protocols, guidelines, and/or benchmarks. Such protocols, guidelines, and/or benchmarks may specify additional procedures relating to instances where GOVCHA has contacted Defendants with respect to GOVCHA assisting particular consumers in the resolution of their complaints.

2. Defendants shall, upon request by GOVCHA, work with GOVCHA and the Nevada Division of Insurance (DOI) to engage in reasonable and good faith efforts to assist GOVCHA in:

a. Developing guidelines and benchmarks for (1) resolution of disputes between health plans and consumers, health plans and Small Group Employers, and/or health plans and employees of Small Group Employers relating to insurance coverage, claims, timing of claims payments, and reimbursements under health care plans; and (2) reviewing claims, claims payments, including the timing of such claims payments, and dispute resolution involving consumers and Small Group Employers;

b. Working with the DOI in the development, consideration, review and/or adoption of such guidelines or benchmarks by the DOI;

c. Preparing and submitting reports identifying the issues discussed, progress on, proposed solutions to and/or resolutions of such issues. These reports shall be public documents.

3. GOVCHA's responsibilities under Sections XI (H)(1) and (2) shall not include representation, advocacy, or dispute resolution between Health Care Providers and insurers. GOVCHA also maintains the sole discretion in staffing and seeking assistance from the health care community in advancing the program under Sections XI (H)(1) and (2) within the budget provided to it. Moreover, Defendants' responsibilities under Sections XI (H)(1) and (2) are independent from the other, and require independent satisfaction.

**I. PHYSICIANS COUNCIL**

30 –Amended Final Judgment

1.     Defendants shall help create a Physicians Council ("PC"), which shall be organized no later than ninety (90) days after entry of the Judgment and which shall meet on a quarterly basis thereafter.  The purposes of the PC are set forth in Exhibit B to this Amended Final Judgment, which is incorporated herein by this reference.

2.     The PC shall be governed, staffed, and operated for the purposes described and under the terms and conditions set forth in Exhibit B which, by this reference, is incorporated herein.

3.     Failure to comply with the terms and conditions governing the PC may be prosecuted by the Nevada Attorney General as a violation of this Amended Final Judgment.

**J.     CHARITABLE CONTRIBUTIONS**

1.     A binding Commitment Letter to the Nevada Attorney General ("Attorney General Charitable Commitment Letter") is set forth as Exhibit C to this Amended Final Judgment, and by this reference is incorporated herein, such Attorney General Charitable Commitment Letter to become binding on entry of this Judgment.

2.     Defendants agree to contribute $15 million over the course of the Final Judgment to fund the health care programs identified in the Attorney General Charitable Commitment Letter.

3.     Amounts set forth in the Attorney General Charitable Commitment Letter shall be paid as and in the manner set forth in Exhibit C.

31 –Amended Final Judgment

4.     The selection of programs and contributions to each program identified in Exhibit C shall be in accordance with Exhibit C and the terms of this Amended Final Judgment.

5.     Contributions described herein shall not replace ordinary course charitable contributions which Defendants currently grant to Nevada entities.

6.     The Nevada Attorney General shall place all contributions to the State of Nevada in the Attorney General Special Revenue Fund 330 ("Fund 330") with a designated interest earning budget account established by the State Controller called the "Attorney General's Charitable Judgment" and shall further distribute to the designated grantees the charitable contributions within five (5) years and three (3) months of the initial contribution.  Defendants shall contribute monies directly to all non-State grantees, without first placing such grants within Fund 330.  Where monies are directly paid to non-State grantees, Defendants shall obtain a grant agreement with such grantees requiring that they spend their grants consistent with the limited uses set forth in the Nevada Attorney General's Charitable Commitment Letter.  Immediate written notice and a copy of each such direct grant to non-State grantees shall be provided to the Nevada Attorney General.  Any Nevada government agency or political subdivision agency grantee that is required to budget for the use of grant funds, or otherwise obtain spending authorization through one or more work programs or revisions, shall seek approval only for the limited uses set forth in the Nevada Attorney General's Charitable Commitment Letter to this Amended Final Judgment.  If spending approval is denied, or is not otherwise possible due to changes beyond the control of the Parties, or any funds

32 –Amended Final Judgment

granted directly by Defendants to non-State grantees, or from the fund and budget

account to any grantee are not spent or otherwise contractually committed by any grantee

within one (1) year of their annual grant, or for any reason there should be any remaining

unspent monies or interest that derive from such an unused grant, all such monies and any

interest shall be remitted or returned to Fund 330 and will be used to enhance or enrich

any program identified in the Attorney General's Charitable Commitment Letter, at the

sole discretion of the Nevada Attorney General, without any need for further court

approval. All grantees will provide the Nevada Attorney General with a one-page annual

certification by May 1 of the year following payment of funds, stating: (1) the name and

authority of the certifying person; (2) date of certification; (3) the specific uses of grant

funds; and (4) the amount of any remaining funds and/or interest from the contribution

for that year. Defendants shall require in their grant agreements that all non-State

grantees send such annual certification to the Nevada Attorney General.

7. Any non-State grantee shall spend its grant consistent with the limited

uses set forth in the Attorney General's Charitable Commitment Letter to this Amended

Final Judgment.

## K. NOTICE OF NEVADA TRANSACTIONS

1. Defendants shall provide written notice to the Nevada Attorney General of

Nevada Transactions. If any Nevada Transaction satisfies the then-applicable Hart-

Scott-Rodino ("HSR") notice requirements or the Form A or Form E filing requirements

of the Nevada Division of Insurance, United will provide a courtesy copy of its HSR

filing and/or Form A or E filing along with the notice. Notice will be provided in writing

and shall include a brief description of the transaction, the parties to the transaction, the anticipated closing date, the health care markets in Nevada which are related to or affected by the transaction, the competitive impact, if any, and the contact persons for all follow-up information requests.

2.      The Nevada Attorney General may request further information from the Defendants of a Nevada Transaction, subject to claims of privilege, undue burden, or other rights Defendants may have in response to such requests.  Such requests shall be Investigative Demands issued by the Nevada Attorney General pursuant to the authority of this Amended Final Judgment and NRS 598A.100.  If such requests are received within the first thirty (30) days of receipt of Defendants' notice as described in Section XI(K)(1), Defendants will defer closing on such transactions for at least forty-five (45) days after receiving such information requests or Investigative Demand.  It is provided that no Nevada Transaction shall be subject to this Section XI (K)(2) if the value of the Nevada assets acquired by Defendants is less than $10 million.

3.      Notwithstanding Section XI (K)(2), Defendants shall be allowed to close any Nevada Transactions, except such transactions that are identified below in this Section XI (K)(3), if  Defendants represent to the State of Nevada in a sworn affidavit that they reasonably believe that (a) there is a clear and significant danger that failing to close the transaction may lead to the withdrawal of the entity, its assets, or a portion thereof, from the market due to business failure or bankruptcy, or (b) the transaction must close in a shorter period of time to avoid Defendants' loss of the transaction.   This Section XI (K)(3) does not apply to transactions requiring Form A or Form E filings, except for transactions approved or directed by the Nevada Commissioner of Insurance or

similar government authority in another State in emergent or other similar circumstances with, or with respect to, organizations in liquidation or whose certificate of authority has been or is being suspended or revoked.

4. Defendants shall take all reasonable steps to notify the Nevada Attorney General of Nevada Transactions qualifying under Section XI (K)(3) as soon as practicable before closing and provide information of such transactions to the Nevada Attorney General, upon request, on an expedited basis.

5. Nothing in this Section XI(K) shall waive, limit or compromise the Nevada Attorney General's authority and ability to:

a. Take enforcement action against Defendants for such Nevada Transactions that violate state or federal law; or

b. Seek a violation of this Amended Final Judgment if the Defendants knew or should have known that invoking Section XI (K)(3) was done in bad faith and/or Defendants failed to take reasonable steps to notify the Nevada Attorney General of such transactions as soon as practicable.

**L.     INGENIX SYSTEM**

1. For a period of two (2) years following entry of this Judgment, Defendants shall not use the Ingenix Prevailing Healthcare Charges System database ("Ingenix System") to establish reasonable and customary charges for reimbursement of out-of-network physicians in Nevada for medical services to enrollees of Health Plan of Nevada or Sierra Health and Life Insurance Company, without prior notice to and consent of the Nevada Attorney General.

35 –Amended Final Judgment

2.      For as long as this Amended Final Judgment is in effect, Defendants shall not use the Ingenix System, or any part thereof, to establish such reasonable and customary charges described in this Section XI (L)(1) if such use of the Ingenix System, or any part thereof, has been declared unlawful by a court of law and such ruling has become final and non-appealable.

3.  Nothing in this Amended Final Judgment shall prevent, prohibit, waive or in any way restrict any Nevada enforcement agency with proper jurisdiction and authority to review and take action against for use by them of the Ingenix System.

**M.**      **[SECTION OMITTED]**

**N.**      **ATTORNEY FEES AND COSTS**

1.      Defendants shall reimburse to the Nevada Attorney General all reasonable attorney fees and costs, including expert costs, incurred by the Nevada Attorney General in reviewing the Transaction.   The total reimbursements to the Nevada Attorney General for attorney fees and costs for this acquisition review and all matters related thereto up to and including entry of this Judgment shall be $875,000.00.  Such reimbursement shall be made within forty (40) days of presentation of a request for reimbursement in writing.

2.      Where the Nevada Attorney General engages in enforcement or compliance actions as described in Sections XII and XIII of this Amended Final Judgment, and where attorneys fees and costs are allowed as described in said Sections, the rate for such attorneys' fees from and after entry of this Amended Final Judgment shall be $350 per hour, and the rate for paralegals shall be $100 per hour.  Such reimbursements shall be made within forty (40) days of presentation of a request for

reimbursement(s) in sufficient detail to allow Defendants to verify the accuracy and appropriateness of all amounts requested.

3. "Sufficient detail" for purposes of this Section shall mean: Identification of all attorneys and paralegals employed by, or contracting with, the Nevada Attorney General by name, total number of hours worked for which the Nevada Attorney General shall seek reimbursement for their work in whole or in part, a summary description of their work, and the hourly rate applied to each individual's work.

## XII. VIOLATIONS AND ENFORCEMENT

A. It shall be a violation of this Amended Final Judgment if one or more Defendants fail to abide by any of the terms of the Final Judgment prior to the entry of this Amended Final Judgment, or upon its entry, the terms of this Amended Final Judgment.

B. Subject to the requirements of Section XII (F), the Nevada Attorney General may petition the Court for relief as a result of a violation of this Amended Final Judgment by filing an appropriate motion or notice of violation which shall set forth the alleged violation and the relief sought by the Nevada Attorney General.

C. For any violations of this Amended Final Judgment committed by Defendants, the Nevada Attorney General may seek one or more of the following remedies:

1. Payment of liquidated damages/fines on the following schedule:

       a.      Up to $10,000 per violation for the first act or transaction constituting a violation;

       b.      Up to $15,000 per violation for the second act or transaction constituting a violation; and

       c.      Up to $25,000 per violation for the third act or transaction constituting a violation.

2.      Notwithstanding Section XII (C)(1), a series of violations that are related by and due to a single underlying and inadvertent mistake, or ministerial or technical cause, as determined by this Court in its discretion, shall represent a single violation of this Amended Final Judgment.  Further, the Court may find in its discretion, that repeated violations of this Amended Final Judgment based on conduct or omissions that are not ministerial or technical in nature shall constitute stand-alone violations without consolidation of such acts into a single violation for purposes of establishing damages or fines.

3.      Payment of liquidated damages or fines of up to $100,000 per violation for the Parties' intentional violations of this Amended Final Judgment. A series of underlying acts under this Section XII(C)(2) shall not constitute a single violation, and each such act that is covered by this Section may, in the Court's discretion, be found to constitute a separate violation of this Amended Final Judgment.

4.      Disgorgement of all profits gained by Defendants resulting from a violation of this Amended Final Judgment.

5.      A civil contempt of court order from the Court retaining jurisdiction over the interpretation, modification and enforcement of this Amended Final Judgment, and all remedies provided by law for obtaining such order.

6.      Other equitable/injunctive relief that the Court deems appropriate.

D.      All relief requested by any party for violation of the provisions of this Amended Final Judgment shall be supported by evidence presented to the Court in whatever form required by the Court, applying substantive Nevada law in interpretation and enforcement.

E.      All damages, fines, disgorgement of profits, and other monetary awards paid pursuant to this Section or a resolution resulting from a compliance investigation, review, audit, or examination pursuant to Section XIII (but excluding attorneys fees and costs) shall be applied to one or more of the programs identified in Exhibit C or any health-related program offered by the State of Nevada (including any of its departments or agencies), a political subdivision in the State of Nevada, or a not-for-profit charitable organization in the State of Nevada at the Nevada Attorney General's sole discretion and without recommendations from Defendants.   Defendants shall also pay to the Nevada Attorney General all of its reasonable attorney fees and costs if the Nevada Attorney

General is the prevailing party in a contested action to interpret, modify, or enforce this Amended Final Judgment.

F.    Notwithstanding the foregoing provisions of this Section XII, the Parties shall not present any alleged violation to this Court for purposes of seeking relief described herein, until the following has occurred:

1.    The Nevada Attorney General has given the Defendants notice of the alleged violation(s) in writing following an investigation, review, audit, or examination;

2.    The Defendants have had a period of at least thirty (30) days to (a) respond to and cure the alleged violation(s) after such notice, and/or (b) provide written notice disputing the alleged violation or presenting cure to the Nevada Attorney General; and

3.    The Parties have had a period of thirty (30) days after Defendants have provided notice of dispute or notice of cure to meet and confer regarding the alleged violation(s) and the Parties' responses.  Such meeting and conferral may occur in person, by telephone, or in writing.

G.    If Defendants fail to respond to and cure, or fail to provide written notice of dispute, the Nevada Attorney General may immediately seek relief from the Court. The Parties may extend the deadlines of this Section by mutual consent in writing, and delivered to the other party.  The Nevada Attorney General may informally notify Defendants of receipt of information alleging a violation of this Amended Final Judgment

40 –Amended Final Judgment

if, in the Nevada Attorney General's judgment, such notification could likely result in a prompt resolution of the alleged violation.

## XIII. COMPLIANCE AND MONITORING

A. For the purposes of determining or securing compliance with this Amended Final Judgment, or to seek additional information relating to Nevada Transactions, or for determining whether this Amended Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the Nevada Attorney General, including consultants and other persons retained by the Nevada Attorney General, shall, upon written request of a duly authorized representative of the Nevada Attorney General, and on reasonable notice to Defendants, be permitted:

(1) Access during Defendants' Nevada office hours to inspect and copy, or at the Nevada Attorney General's option, to require that Defendants provide in Nevada, copies of, all books, ledgers, accounts, records and documents in the possession, custody, or control of Defendants, relating to any matters contained in this Amended Final Judgment; and

(2) To interview, either informally or on the record, Defendants' current or former officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B. All written requests of the Nevada Attorney General's authorized representative for such information shall be by Investigative Demand issued pursuant to

the authority of this Amended Final Judgment and NRS 598A.100. Upon receipt of such written request, Defendants shall submit written reports, provide answers orally or in writing, including, but not limited to, responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Amended Final Judgment.

C.     One (1) year after entry of this Judgment and annually on the anniversary of that date for the period that this Judgment is in effect, Defendants shall file written confidential compliance reports with the Nevada Attorney General setting forth in detail the manner and form in which they intend to comply, are complying, and have or have not complied with this Amended Final Judgment. Defendants' compliance reports shall include a detailed description of the efforts being made to comply with this Amended Final Judgment (including, but not limited to, a description of the facts or circumstances leading to any investigation by Defendants into non-compliance, the person or persons conducting the investigation and a summary of findings), and attach as exhibits any information or documents that demonstrate compliance or non-compliance. Accompanying the compliance report, Defendants shall submit a certification(s) under oath that the report is accurate, complete, and does not omit any information that is reasonably calculated to inform the Nevada Attorney General regarding Defendants' compliance or non-compliance with this Amended Final Judgment. Individuals providing such certification(s) on behalf of Defendants shall not be held criminally or civilly liable for errors reflected in compliance reports based upon good faith. If Defendants become aware that previously provided compliance reports are not accurate, complete, and/or omit information reasonably calculated to inform the Nevada Attorney General regarding Defendants' compliance or non-compliance with the Amended Final

42 –Amended Final Judgment

Judgment, Defendants shall provide a certified confidential supplement to the confidential compliance report reflecting the additional information.

D.     Upon written request of the Nevada Attorney General given a concern that a violation of this Amended Final Judgment may have occurred, Defendants shall submit written confidential reports, under oath if requested, relating to any of the matters contained in this Amended Final Judgment.  Such written reports, at the Nevada Attorney General's discretion, may require Defendants to conduct, at Defendants' cost, an independent audit or analysis relating to any of the matters contained in this Amended Final Judgment.  Such an audit or analysis by an independent team within Defendants' operations but external to the business unit being audited or analyzed may be deemed independent for purposes of this Section upon prior approval of the Nevada Attorney General.

E.     Nothing in this Amended Final Judgment shall waive, or be in derogation of, the right of the Defendants to assert non-jurisdictional objections to requests for access, information, interviews or copying hereunder.  If Defendants assert non-jurisdictional objections, the Parties shall meet and confer on such objections and Defendants shall otherwise substantially comply with all requests to which no objections are asserted.

F.     If the Nevada Attorney General has given Defendants written notice of a compliance concern within six (6) months of discovery of facts giving rise to such concern, Defendants will pay for the reasonable costs of investigations, reviews, audits or examinations conducted by the Nevada Attorney General regarding matters contained in

this Amended Final Judgment. This specifically includes the reasonable costs of retained accountants, actuaries, attorneys and other experts reasonably necessary to assist in the conduct of any investigation, review, audit or examination once it has been opened, and attorneys and paralegals shall be compensated at the professional service rates set forth in Section XI (N)(2), but shall not otherwise include costs of oversight of compliance with this Amended Final Judgment.

## XIV.   NO REACQUISITION

Defendants may not reacquire any part of the Divestiture Assets during the term of this Amended Final Judgment provided, however, that this Amended Final Judgment shall not prohibit Defendants from offering individual Medicare Advantage Plans in the ordinary course of business otherwise in conformity with this Amended Final Judgment.

## XV.   RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Amended Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Amended Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XVI.   NO ADMISSIONS OF STANDING OR AUTHORITY OR VIOLATIONS OF LAW

This Judgment shall neither be construed nor interpreted as a concession or a resolution of the dispute among the Parties that the Defendants violated any federal or state laws, nor that the Defendants have adopted or agreed to any terms in Plaintiff's

Competitive Impact Statement or Complaint.  Nothing in this Judgment shall be construed or interpreted as a concession or a resolution of the dispute among the Parties regarding the Nevada Attorney General's standing or authority to bring an enforcement action to prevent or seek other relief from the Transaction under state or federal law or any merger involving health care insurers doing business in Nevada.  Notwithstanding the foregoing, the Parties agree to enter into this Judgment instead of litigating their dispute.  The Parties further agree that the Nevada Attorney General is authorized by this Judgment to apply to this Court for an interpretation or modification of this Judgment and to enforce the terms of this Judgment.

## XVII.    SCOPE OF RELEASES

### A.    Release

Plaintiff State of Nevada, as of the date of entry of this Final Judgment, forever waives, releases, relinquishes, and discharges all claims in its action against the Defendants, and each of them, as well as the Defendants' officers, directors, shareholders, subsidiaries, past subsidiaries, affiliates, past affiliates, partners, members, agents, attorneys, assigns, beneficiaries, employees, heirs, insurers, predecessors, successors, and other professional persons, directly or indirectly, derivatively, on their own behalf, on behalf of any person or entity they represent, from any and all actions, causes of action, obligations, costs, damages, losses, claims, liabilities, restitution, and/or demands of whatsoever character, whether known or unknown, accrued or unaccrued, arising out of or relating in any way to the claims stated in the Complaint filed herewith or to the Transaction or the competitive effects thereof.

45 –Amended Final Judgment

**B.   Limitations on and Exclusions from Releases.**

Notwithstanding anything to the contrary contained herein:

1.       *Bodily Injury and Property Damage Claims by State of Nevada*.

This Judgment does not release claims that Plaintiff, its employees, agencies, or

other subdivisions may have against the Defendants for bodily injuries or physical

damage to real or personal property.

2.       *Contract Based Claims*.  This Judgment does not release claims

that Plaintiff, its employees, agencies, or other political subdivisions may have

against any Defendant under a contract or franchise agreement with a Defendant.

3.       *On-Going and Future Proceedings*.  Nothing in this Judgment

shall restrict the ability of Plaintiff to continue to participate in any existing

proceeding, or to bring or participate in any future proceeding, which presents a

claim not released under Section XVII(A) above. This includes, but is not limited

to, a proceeding involving how health insurers pay for out-of-network Health

Care Providers.

4.       *DOI Orders*.  Notwithstanding any other provision of this

Judgment, nothing in this Judgment shall restrict the ability of the State of

Nevada, DOI, from issuing orders, penalizing, or otherwise regulating the

business of insurance as against the merging parties, including but not limited to,

enforcing the Order of the Division of Insurance in Cause No. 07.188 dated

August 27, 2007, and the August 3, 2007 Commitment letter submitted by

Defendants to the DOI, or enforcing the NRS 686A.

46 –Amended Final Judgment

5. *Final Judgment.* Notwithstanding any other provision in this Judgment, the foregoing release shall not relieve Defendants of their obligations under this Judgment.

6. *Medicaid.* Notwithstanding any other provision in this Judgment, this release shall not release Defendants from any claim that Nevada Medicaid may have against Defendants.

**C.    Other Release-Related Provisions**

1. *Specific Limit of Waivers.* Notwithstanding anything herein to the contrary, nothing in this Final Judgment shall constitute a limitation on, or waiver of, any right to enforce any obligation or pursue any remedy specifically provided for in this Judgment.

2. *No Third Party Beneficiaries of Releases.* No parties other than the individuals and entities listed in Section XVII(A)  shall be entitled to the benefits of, or entitled to enforce, the releases provided for in this Judgment.

3. *Fairness of Settlement and Releases.* The Parties agree that this Judgment and the releases and waivers of this Judgment are fair and reasonable and adequate to provide complete satisfaction of the interests of the Plaintiff.

4. *Negotiation of Releases.* Each of the Parties acknowledges and agrees that the various releases in this Judgment were individually negotiated with the various releasing parties under such releases and such releases should be

47 –Amended Final Judgment

interpreted individually in the context of this Judgment without regard to other releases herein.

### D.   No Waiver, Release or Prohibition

Nothing in this Judgment prohibits, bars, or otherwise limits the Nevada Attorney General's authority to review, challenge, or seek relief from any of Defendants' acquisitions, joint ventures, contracts, policies or practices (other than the Transaction), including, but not limited to, Defendants' acquisition of Fiserv Health or any of the Nevada Transactions, regardless whether such transactions are reportable pursuant to Section XI(K) of this Judgment.

## XVIII.   EXPIRATION OF AMENDED FINAL JUDGMENT

This Amended Final Judgment shall expire five (5) years from the date of entry of the Final Judgment, provided, however, that (a) certain provisions that are in force for less than five (5) years shall expire at the time expressed elsewhere in this Amended Final Judgment, and (b) this Amended Final Judgment may remain in effect after completion of such five (5) year period solely for the purpose of determining or enforcing compliance during its five (5) year effective period with its terms.

## XIX.   AGGREGATE REMEDIES

The remedies in this Amended Final Judgment are in addition to all remedies available to the Nevada Attorney General under federal and state law.  Nothing in this Amended Final Judgment shall prohibit or in any way limit the Nevada Attorney General from seeking all damages, fines, penalties and remedies for Defendants' non-released conduct, actions, transactions, mergers or acquisitions that is/are otherwise unlawful

48 –Amended Final Judgment

under federal or state law, even if such conduct, actions, transactions, mergers or acquisitions may also violate this Amended Final Judgment.

## XX. CONFIDENTIALITY

No information or documents obtained by the means provided in Section XI(K), Section XIII or otherwise as required by this Amended Final Judgment shall be divulged by the Nevada Attorney General to any person other than the authorized representatives of the Nevada Attorney General, and their consultants, except in the course of legal proceedings as required by a court of proper jurisdiction, for the purpose of securing compliance with this Amended Final Judgment (including disclosure of documents at interviews on the record that an interviewee authored or previously received), to the United States Department of Justice Antitrust Division, the Federal Trade Commission, or the Nevada Division of Insurance (as long as these entities can maintain the confidentiality of the information or documents), or as otherwise required by law. If at the time information or documents are furnished by Defendants to the Nevada Attorney General, Defendants shall represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the Nevada Attorney General shall give Defendants ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than grand jury proceedings).

## XXI. MISCELLANEOUS

49 –Amended Final Judgment

If any part of this Amended Final Judgment is hereafter adjudged by this Court to be unenforceable, the remaining provisions of this Amended Final Judgment shall stay in full force and effect.

## XXII.   PUBLIC INTEREST

THE COURT FINDS that entry of this Amended Final Judgment is in the public interest.

IT IS SO ORDERED:

_____

UNITED STATES DISTRICT JUDGE

DATED: ___June 23, 2011_____

**Exhibit Index**

| Number | Description |
|--------|-------------|
| A | University Medical Center Commitment Letter |
| B | Nevada Physician Council |
| C | Attorney General Charitable Commitment Letter |

# EXHIBIT A

# EXHIBIT A



**UnitedHealthcare®**

A UnitedHealth Group Company

**Forrest G. Burke, General Counsel**
MN012-N205
5901 Lincoln Drive
Edina, MN 55436
Tel 952-992-4002 Fax 952-992-5251
forrest_burke@uhc.com

## EXHIBIT A TO FINAL JUDGMENT

February 25, 2008

Kathy Silver
University Medical Center
1800 West Charleston
Las Vegas, NV 89102

Re:    UnitedHealth – Sierra Merger

Dear Kathy:

We are pleased to provide this letter in connection with the proposed acquisition (the "Merger") of Sierra Health Services, Inc. ("Sierra") by UnitedHealth Group Incorporated ("UnitedHealth") to further evidence our ongoing commitment to University Medical Center ("UMC") and the general well-being of all Nevadans.  Pursuant to our recent discussions regarding certain concerns raised by UMC about the Merger, including certain billing disputes between UMC and UnitedHealth, and as discussed with Attorney General Catherine Cortez Masto, UnitedHealth hereby agrees to and confirms the following:

(a)    Following the Merger, (i) with respect to legacy UnitedHealth business, UnitedHealth and UMC will continue to operate in accordance with the current terms and conditions of the existing hospital participation agreement between the parties, including the reimbursement rates set forth therein, through at least December 31, 2009, and (ii) with respect to Sierra business, the parties will operate in accordance with the terms and conditions of the existing hospital participation agreement between Sierra and UMC through the current term of such agreement.

(b)    Neither UnitedHealth or Sierra (on the one hand) nor UMC (on the other) will unilaterally terminate their respective hospital participation agreements prior to the end of such agreements' current terms absent material breach thereof by UMC, UnitedHealth or Sierra, as the case may be; for purposes of this letter, in accordance with (a) above, the end of the current term of the UnitedHealth hospital participation agreement shall be December 31, 2009.

(c) Unless otherwise agreed to by UMC, during the current terms of their respective hospital participation agreements, neither UnitedHealth nor Sierra will implement any program specifically designed to steer or engage in any practice or adopt any guideline that has the purpose or effect of steering a disproportionate share of its members requiring high cost services (e.g., neuro surgery or open heart procedures) to UMC vis-à-vis other participating hospitals in Clark County, NV that provide the same services; nor will UnitedHealth or Sierra steer members away from UMC for any services for which UMC is contracted to provide; it being understood, however, that UnitedHealth and Sierra cannot account for any member's or physician's choice to obtain such services from UMC or another facility regardless of any steerage utilized by UnitedHealth and/or Sierra.

(d) In a good faith effort to resolve certain billing disputes between UnitedHealth and UMC (including payment for urgent care claims and certain accounts receivable over 90 days past due), UnitedHealth will make a cash advance to UMC in the amount of $2,200,000 (the "First Cash Advance"). The First Cash Advance (and all Subsequent Cash Advances (as defined below)) will be made and reconciled pursuant to the terms of a cash advance agreement to be executed by the parties, which agreement will initially include exhibits that specifically identify the claims to be reconciled and to which the First Cash Advance will be applied. Commencing as of August 1, 2008 and every six months thereafter until December 31, 2009, under the terms of the cash advance agreement, UMC will prepare and submit to UnitedHealth a report (each, an "A/R Report") of all UnitedHealth accounts receivable over 90 days past due. Within ten business days of receipt of a written request by UMC (accompanied by an A/R Report), UnitedHealth will remit to UMC additional cash advance payments (each such payment, a "Subsequent Cash Advance") equal to (i) 50% of billed charges for all clean claims set forth on the applicable A/R Report, less (ii) the unapplied portion of the First Cash Advance or any previously paid Subsequent Cash Advance; provided, however, that if such amount is a negative number, UnitedHealth shall be permitted to apply such amount to any other outstanding clean claims then due and payable to UMC by UnitedHealth. Each cash advance paid to UMC in accordance with the terms of the cash advance agreement will be recorded by UMC as a liability to UnitedHealth (with interest thereon accruing in favor of UMC) pending resolution and payment of clean claims set forth on the applicable exhibit or A/R Report (as the case may be); for clarity, UMC will apply the First Cash Advance and Subsequent Cash Advances (or portions thereof) to mutually agreed upon clean claims set forth on the applicable exhibits or A/R Reports and will not use the cash advances for any other purpose. It is understood and agreed that the parties have substantially resolved their dispute regarding certain PacifiCare hospital-based physician claims and that such dispute will be determined and settled in accordance with the settlement agreement currently being reviewed by UMC and not pursuant to the cash advance process set forth above.

(e)    UnitedHealth and Sierra will work in good faith with UMC to develop and implement a mutually acceptable streamlined billing and claims dispute resolution process (the "UMC Service Model"), which process will include (i) a single, dedicated provider service representative to help identify root cause and coordinate resolution for all UMC claim payment issues and (ii) implementation (at a mutually acceptable time) of UnitedHealth's HP3 program. Within 90 days after consummation of the Merger, the parties will mutually agree upon a service level agreement relating to the UMC Service Model; such service level agreement will include a mutually acceptable "short form" dispute resolution process to resolve disputes arising under the terms thereof (e.g., binding mediation).

(f)    UnitedHealth and UMC will take all reasonable actions necessary to effectuate the purposes of this letter as promptly as practicable, including the execution of any definitive agreements necessary to carry out the purposes and intent hereof.

(g)    The commitments made in this letter shall be enforceable by an action to compel specific performance, as well as by any other remedies provided for in the current contracts between United Health and UMC and Sierra and UMC.

(h)    The commitments set forth herein are contingent upon execution of a mutually agreeable release among UnitedHealth, Sierra, UMC and Clark County.

(i)    The provisions contained herein and all agreements, processes and protocols resulting therefrom shall become amendments to the contracts between UMC and UnitedHealth and UMC and Sierra.

(j)    There are no restrictions, promises, representations, warranties, covenants, or undertakings other than those expressly set forth herein.

(k)    Proposed amendments to this letter agreement will be adopted and become effective as amendments only on the unanimous, written approval by the parties to this letter agreement.

(l)    This agreement may be executed in two or more counterpart signature pages, which together shall constitute one letter agreement. Facsimile signature pages constitute valid signature pages.

(m)    If any term or provision of this letter agreement is held to be void or unenforceable, that term or provision shall be severed from this agreement, the balance of the Agreement shall survive and be reasonably be construed so as to carry out the intent of the parties as evidenced by the terms of this letter agreement, and the parties shall take steps to implement terms and protocols to address issues that were intended to be addressed by the void and unenforceable provision(s).

    (n)    This Agreement and the rights of the parties under it will be governed by and interpreted in accordance with the laws of the state of Nevada (without regard to principles of conflicts of law).

    (o)    In arbitration actions and/or in a court action, the losing party/ies shall reimburse to the prevailing party/ies all reasonable attorney fees, and expenses, including expert witness costs if such costs were reasonably necessary to the address the dispute or question.

UnitedHealth values its relationship with UMC and we look forward to strengthening that relationship through the Merger. If this letter meets your understanding of the parties' recent discussions regarding these matters, please countersign below and return a signed copy to me via facsimile at 952/992-7086.

Please contact me at the number listed above should you have any further questions about the Merger or the contents of this letter.

Agreed to and Accepted this 25th day of February, 2008

UNITEDHEALTH GROUP INCORPORATED

By: _____
Its: _____ UnitedHealthcare General Counsel

Agreed to and Accepted this ___ day of February, 2008

UNIVERSITY MEDICAL CENTER

By: _____
Its: _____

Cc: The Honorable Catherine Cortez Masto

4

# EXHIBIT B

# EXHIBIT B



UnitedHealthcare®
A UnitedHealth Group Company

## EXHIBIT B TO FINAL JUDGMENT

### THE NEVADA PHYSICIAN COUNCIL

A.      Defendants United HealthGroup Incorporated and Sierra Health Systems, Inc. (Defendants or United/Sierra) will convene a Nevada Physician Council (PC) that will meet on a regular basis, and not less than four times in a twelve month period, to discuss issues of concern to Nevada physicians, and to establish goals and benchmarks for voluntary compliance relating to the physician-payor relationship and the quality and delivery of health care to Nevada consumers.

B.      The PC is intended to be:

1. A forum for Defendants and the Nevada physician community to consult with and inform each other about issues impacting the physician community in Nevada and/or the health care industry in general, with the common goals of improving communication around policies and protocols implemented by United/Sierra and finding collaborative solutions to improve the physician-payor relationship.

2. A forum for physicians and Defendants to resolve concerns that physicians have relating to the quality and delivery of health care to Nevada consumers, physician contracting practices,  contracting with facilities, quality assurance and staffing issues, authorization requirements, determination of quality care and evidence based medicine, and claims processing.

3. A vehicle by which physicians and Defendants will establish goals and benchmarks on issues identified in Section B (1) and (2).

4. A vehicle by which physicians and Defendants may prepare regulatory proposals to the Division of Insurance and/or bills to the Nevada Legislature to address the issues described herein.

1 – **EXHIBIT B TO FINAL JUDGMENT**
**STATE OF NEVADA** v. **UNITEDHEALTH GROUP INCORPORATED and SIERRA HEALTH SERVICES, INC.**

5. It is not the intent of this Judgment or this Exhibit B to allow conduct or actions which would otherwise violate the federal or state antitrust laws.

C. At all times during the operation of the PC:

1. The PC will consist of at least two United/Sierra representatives and nine participants from the practicing physician community in Nevada who participate in United/Sierra networks and who represent a broad spectrum of physician practices, including individual physicians, physician groups (both large and small), physicians that are independently contracted, and physician practices in both urban and rural settings, with a range of specialties. At least one physician member of the PC shall also be a participating member of United's national physician advisory council, and no more than one physician member of the PC shall be employed by SMA. The Attorney General may designate from the office of the Attorney General his/her representative to attend any and all PC meetings.

2. The initial members of the PC will be selected among current United/Sierra participating physicians and physician groups as follows: the Attorney General will select five physician participants and Defendants will select four physician participants. In addition, the Attorney General may, after consultation with Defendants and at her discretion, select a physician to sit as an ex officio member of the PC and who may participate in activities of the PC, provided, however, that such member shall not be entitled to participate in closed PC meetings with participating physician PC members where operational matters involving relationships or dealings of Defendants with participating physicians or services by participating physicians for Defendants' members are discussed.

3. The members shall establish guidelines and protocols to create staggered terms for the PC members, to notice meetings, to create a complaint and resolution process within the framework of the PC with respect to its operations, and to keep minutes of all such meetings. Physician vacancies will be filled by nomination and majority vote of the remaining physician members of the PC. A vacancy in the ex officio position shall be filled only by the Attorney General.

D.     At the end of each calendar year, the PC shall prepare a report for the public identifying the issues discussed and progress on, proposed solutions to and/or resolutions of such issues.

E.     All members of the PC will be required to execute a confidentiality agreement requiring that all proprietary information that Defendants own, are licensed to use, or have an obligation relating to the use or disclosure thereof, discussed or disclosed during the PC meetings shall remain confidential unless otherwise agreed to by Defendants in writing.  The confidentiality agreement and all changes thereto shall be approved by the Attorney General before its use in order to ensure that such agreement shall not extend beyond its intended purpose and scope.

F.     Under no circumstances may current or future physician rates, rate plans or rate reimbursement, components thereof, or complaints relating thereto be proposed, discussed, addressed or exchanged among the PC members or their representatives.  No immunities or protections are afforded to any person or entity that engages in such conduct because this Exhibit has been incorporated into the Judgment, because this program was created by the terms of such Judgment and/or because of this Court's approval of such Judgment.  Unless otherwise set forth under Nevada state law, Nevada, its state agencies or its political subdivisions are not authorized by this Judgment or this Exhibit to review and actively supervise the conduct described in this Section F for purposes of providing immunity from state and federal antitrust laws.

G.     This Exhibit B may be executed with original, counterpart signature pages. Facsimile signatures shall suffice for and have the full force and effect of original signatures.

Reviewed, approved, and agreed to by:

Dated this 25 day of February, 2008

_____

Marie Martin-Kerr, Senior Deputy Attorney General
For State of Nevada

Dated this 25th day of February, 2008

_____

Forrest G. Burke, General Counsel, UnitedHealthcare
for UnitedHealth Group Incorporated
and Sierra Health Systems, Inc.

# EXHIBIT C

# EXHIBIT C



**UnitedHealthcare®**

A UnitedHealth Group Company

**Forrest G. Burke, General Counsel**
MN012-N205
5901 Lincoln Drive
Edina, MN 55436
Tel 952-992-4002 Fax 952-992-5251
forrest_burke@uhc.com

## EXHIBIT C TO FINAL JUDGMENT

February 25, 2008

The Honorable Catherine Cortez Masto
Attorney General
State of Nevada
100 North Carson Street
Carson City, Nevada 89701-4717

Re:     State of Nevada v. UnitedHealth Group Incorporated & Sierra Health Services, Inc.

We are pleased to provide this letter in connection with the acquisition (the "Merger") of Sierra Health Services, Inc. ("Sierra") by UnitedHealth Group Incorporated ("UnitedHealth") to further evidence our ongoing commitment to the State of Nevada. As set forth in the Final Judgment, dated on or about February 25, 2008, relating to the Merger (the "Final Judgment"), UnitedHealth's, Sierra's and the Attorney General's consent to the entry of the Final Judgment (and the Attorney General's approval of the Merger) is conditioned, in part, upon the commitments set forth in this letter. Further, the commitments set forth in this letter are expressly conditioned upon the entry of the Final Judgment.

To demonstrate the commitment of UnitedHealth and Sierra to the Nevada community, UnitedHealth and Sierra agree to contribute (either directly or through affiliated entities) $15 million to benefit Nevada health care consumers over a period of five years following the closing of the Merger (the "Charitable Commitment") in accordance with the attached Schedule A.[1] The contributions made pursuant to the Charitable Commitment shall also be subject to the terms and conditions set forth in the Final Judgment.

Our Charitable Commitment is intended to provide meaningful benefits to individual Nevadans in need as well as key organizations that are essential to providing health care services and coverage to Nevadans. We will work with the Office of the Attorney General each year to highlight publicly the Charitable Commitment and the benefits it will deliver for Nevada.

---

[1] For purposes of clarification, if the Merger does not occur, the Charitable Commitment shall terminate and this letter shall be of no further force or effect.

The first annual payment will be made to the Office of the Attorney General (or directly to the program or entity identified in Schedule A, as the case may be) within ten (10) days following the divestiture contemplated by the Final Judgment but in no event later than May 15, 2008. Thereafter, four annual payments will be made to the Office of the Attorney General (or directly to the program or entity identified in Schedule A to this Letter, as the case may be) on May 1st of each subsequent year for such four year period.

For charitable contributions which are made directly to an entity or program which is not part of the State of Nevada, UnitedHealth and Sierra will enter into a written agreement with such grantees requiring them to use the charitable contributions in a manner consistent with the purpose of the donation. To the extent such donations are not utilized for the identified purpose(s), or there is any unused portion remaining, the agreement will also require the entity or program to return such amounts to the Attorney General's Special Fund to be used in accordance with the terms of the Final Judgment.

UnitedHealth values its relationship with the State of Nevada and is committed to expanding access to health and well-being services for state residents. We look forward to working with you and your staff to fulfill the potential of this Charitable Commitment.

UnitedHealth agrees that the agreements set forth in this Charitable Commitment letter are incorporated by reference to, and enforceable by, the Final Judgment.

Yours very truly,

Forrest G. Burke
General Counsel, UnitedHealthcare


cc:     Governor Jim Gibbons
        Commissioner Alice A. Molasky-Arman

## SCHEDULE A TO EXHIBIT C

## I.     HEALTH AND HUMAN SERVICES

| HHS | Grant to HHS for enhancing health and welfare for Nevadans. | Year 1:  $1,500,000<br>Year 3:  $67,446<br>Year 4:  $67,447<br>Year 5:  $67,446<br><br>Total $1,702,339 |
|---|---|---|
| Community Health | The Nevada State Health Division Community Health Nursing program provides public health nursing in primary clinic locations and satellite locations across rural Nevada.  Community Health services are provided at low cost or on a sliding scale dependent on income for wellness programs such as family planning, health education, cancer screening, well child examinations, etc.  This donation will enhance the provision of such primary and preventive care programs which provide the 'safety net' for health care in rural areas.  Community Health provides services primarily to low-income working families, the uninsured and other high-risk populations, and the donation would replace lost funding over a three year period. | Years 1-3:  $124,000<br><br>Total $372,000. |
| Mammograms | Nevada Health Centers operates the *Nevada Health Centers Mammovan*. The *Mammovan* is a mobile mammography van that travels to underserved areas of Nevada to provide mammograms to geographically isolated and/or uninsured women who probably would not seek out mammography services on their own. On occasion, the Mammovan travels with a Physician Assistant who provides clinical breast exams, pelvic exams and pap smears. | Year 2: $25,000<br>Years 3-5: $75,000<br><br>Total $250,000. |
| Medicaid | Website administered by the State of Nevada containing information on the quality of Nevada hospitals.  These quality rankings cause hospitals to compete in quality of care, thereby improving outcome measures for patients. | Year 4:  $250,000 |

| Medicaid | Website administered by the State of Nevada allowing consumers to compare prescription drug prices to allow consumers, including seniors and the disabled, to price shop. | Year 4: $160,000 |
|---|---|---|
| Triage – Mental Health | The State of Nevada ranks 37th in mental health spending among the states in the area of mental health, and is #4 for suicide rates. Mental health patients contribute to overflowing emergency rooms, especially in Southern Nevada. Triage is a program which diverts the mentally ill and inebriated from emergency rooms and 'detox centers' so they can receive appropriate services The donation for this program would restore most of the $600,000 in funds which were cut over two years in both Northern and Southern Nevada. We recommend splitting the funds evenly between Northern Nevada and Southern Nevada. Although Northern Nevada serves less people, the budget cuts were greater in the North on a pro rata basis. | $250,000 in Year 1 $250,000 in Year 2 Total: $500,000 |
| Mobile Mental Health | The mobile mental health program is a program focused on Reno/Sparks, and which was supposed to be implemented beginning in 2009. Thus, by replacing all lost funding in 2009 and 2010, this program will be able to commence service. | $151,000 in Year 1 $194,000 in Year 2 Total: $345,000 |
| Nevada Family Resource Centers | There are 18 Family Resource Centers (FRCs) throughout Nevada providing information, referrals, and case management to residents in each Service Area. FRCs collaborate with local and state agencies and organizations to help individuals and families access needed services and support. In the urban areas of Clark and Washoe counties, there are multiple FRC sites located to serve higher density at-risk populations. In Washoe County, there are five satellite locations and in Clark County there are five separate sites in the greater Las Vegas area with three additional sites serving northern and southern rural Clark County. | Year 1: $102,302 Year 2: $170,988 Total: $273,290 |

| | Most FRC sites are co-located with Family to Family programs that provide parenting classes and support groups with outreach to at-risk populations. Additional services may be offered through leveraged funding, including: immunizations and well-baby checks, access to health care, and information and referral services for senior citizens to assist them in accessing resources and programs available in their homes and community. | |
|---|---|---|
| Autism Program | The Nevada Autism Program provides assistance to families with children who have autism spectrum disorder. | Year 2: $87,600 |
| Nevada 211 | Nevada 211 is a 'one stop shop' for information on health and other services. For example, one call to Nevada 211 provides access to basic human services, physical and mental health resources, etc. | Year 1: $103,897 <br> Year 2: $104,705 <br><br> Total: $208,602 |
| Fetal Alcohol Clinics | The donation for Fetal Alcohol Clinics will fully fund 25 diagnostic clinics for fetal alcohol syndrome, in both northern and southern Nevada. | Year 1: $101,169 |
| Emergency Medical Services | The donation will assist with purchasing EMS equipment and updating ambulances across the state. There are matching funds available from local governments for these purchases. | Year 4: $300,000 |

**TOTAL**

| | | |
|---|---|---|
| **YEAR 1** | **$** | **2,332,368.00** |
| **YEAR 2** | **$** | **956,293.00** |
| **YEAR 3** | **$** | **266,446.00** |
| **YEAR 4** | **$** | **852,447.00** |
| **YEAR 5** | **$** | **142,446.00** |
| **SUBTOTAL HHS** | **$** | **4,550,000.00** |

## II.    PROGRAMS OUTSIDE HHS INFRASTRUCTURE

| | | |
|---|---|---|
| UMC | Community Access Fund to be used for assisting, facilitating or enhancing healthcare delivery to the uninsured and underinsured population in Southern Nevada.<br><br>*This organization is not a part of the State of Nevada for purposes of this document.* | Year 1: $2,000,000<br>Years 2-4: $1,268,500/year<br>Year 5: $1,369,500<br><br>Total $7,175,000 |
| SNHD | Grant for the Southern Nevada Health District for its Immunization Child Care Program and to provide immunizations free of administrative charges to local businesses, including small businesses, and to serve 100 high-risk families with first-time births with free enrollment in the Nurse-Family Partnership Program, including 3,000 home visits.  This grant would represent approximately 16% of the funding for the described programs, and is more than the requested amounts.<br><br>*This organization is not a part of the State of Nevada for purposes of this document.* | Year 1: $632,632<br>Year 2: $663,465<br>Year 3: $703,903<br><br>Total:  $2,000,000 |
| GOVCHA | Fund at least one position within the Governor's Consumer Healthcare Assistance program for small employer education and advocacy for 5 years.  Funds would also allow GOVCHA representatives with training, travel and to attend programs to educate the public. | Years 1-5: $125,000<br><br>Total $625,000 |
| DOI | Revolving fund within DOI, to provide DOI with necessary resources to pay for audits of all insurers 'up-front'.  Fund to be reimbursed by individual insurers following DOI audits. | Year 1: $350,000 |
| UNLV | Nursing Program.  Matching funds from Sierra Health Services.<br><br>*This organization is not a part of the State of Nevada for purposes of this document.* | Years 1-5: $50,000<br><br>Total $250,000 |
| Blue Ribbon Panel | Grant to cover administrative expenses for annual Attorney General Blue Ribbon panel held to discuss healthcare delivery issues affecting the State of Nevada, bringing to the table various groups including government, private employers and provider representatives. | Years 1-5: $10,000<br><br>Total: $50,000 |

**TOTAL**

| | | |
|---|---|---|
| YEAR 1 | $ | 3,167,632.00 |
| YEAR 2 | $ | 2,116,965.00 |
| YEAR 3 | $ | 2,157,403.00 |
| YEAR 4 | $ | 1,453,500.00 |
| YEAR 5 | $ | 1,554,500.00 |
| SUBTOTAL NON-HHS | $ | 10,450,000.00 |

**TOTAL OF ALL PROGRAMS PER YEAR**

| | | |
|---|---|---|
| YEAR 1 | $ | 5,500,000.00 |
| YEAR 2 | $ | 3,073,258.00 |
| YEAR 3 | $ | 2,423,849.00 |
| YEAR 4 | $ | 2,305,947.00 |
| YEAR 5 | $ | 1,696,946.00 |
| TOTAL | $ | 15,000,000.00 |